IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| BENTON W. MILLER,<br><br>                    Plaintiff,<br><br>        vs.<br><br>UNION PACIFIC RAILROAD COMPANY, a Delaware corporation; SWIFT TRANSPORTATION COMPANY OF ARIZONA, LLC, a Delaware corporation; ABDIKADIR MOHAMED, ABDINASIR DIRIE, and SWIFT TRANSPORTATION CO. OF ARIZONA, LLC, a Delaware limited liability company;<br><br>                    Defendants. | **8:18-CV-568**<br><br>**MEMORANDUM AND ORDER** |

This matter is before the Court on eight motions in limine filed by defendants Swift Transportation Company of Arizona and Swift Leasing Company ("Swift") and Abdikadir Mohamed, Filing 177; Filing 180; Filing 183; Filing 186; Filing 189; Filing 192, and defendant Union Pacific Railroad Company, Filing 201; Filing 204.

## I. BACKGROUND

This case arises out of a collision between a train and a semi-truck that occurred after the truck became stuck on railroad tracks at a private crossing. Filing 54 at 4. Defendant Union Pacific Railroad Company operated the train. Filing 54 at 4. Plaintiff Benton Miller was Union Pacific's conductor aboard the train. Filing 54 at 4. Defendant Abdinasir Dirie owned the truck involved in the collision, and defendant Abdikadir Mohamed was driving the truck as his employee when the vehicle became stuck on the tracks. Filing 54 at 4. Mohamed was en route delivering goods pursuant to a contract between Dirie and Swift on the night of the collision. Filing 54 at 4.

1

The collision occurred shortly after 1:00 a.m. on December 21, 2015. Filing 54 at 4; Filing 112 at 8. The truck became stuck on railroad tracks after Mohamed turned off of the highway onto a private driveway, then tried to turn his truck onto railroad tracks as if he intended to drive down the tracks. Filing 112 at 8; Filing 160-5 at 3; Filing 160-6 at 16. Unable to get the truck off of the railroad tracks, Mohamed and his co-driver, Abdi Aden, exited the truck and Mohamed called 911. Filing 190 at 1; Filing 160-6 at 12. The train impacted the truck while Mohamed was on the phone with the 911 operator. Filing 230 at 2. Miller alleges he was injured in the collision. Filing 54 at 7. He asserts the collision caused injuries to both of his shoulders and caused him to develop post-traumatic stress disorder ("PTSD"), rendering him unable to return to work at Union Pacific. Filing 226 at 1.

Miller now brings actions for alleged injuries he sustained during the collision under theories of negligence against Mohamed, vicarious liability for negligence against Dirie and Swift, and negligence against Union Pacific under the Federal Employees Liability Act ("FELA"), 45 U.S.C. §§ 51-60. Filing 54. Union Pacific seeks indemnity from Swift and Mohamed for payments it may be liable for under the FELA. Filing 63 at 12-13. Other cross-claims for damages from property loss between Defendants were previously resolved. *See* Filing 131. Swift and Mohamed allege Union Pacific and/or Miller were contributorily negligent. Filing 59 at 5; Filing 112 at 5. In an order issued today, the Court grants summary judgment in Union Pacific's favor on both Miller's FELA claim and Swift and Mohamed's contributory negligence defense. Filing 251. Accordingly, Union Pacific's motions in limine (Filing 201[1]; Filing 204[2]) are denied as moot.

---

[1] In Filing 201, Union Pacific sought to exclude certain opinion testimony of Swift and Mohamed's experts Richard Beall and James Loumiet.

[2] In Filing 204, Union Pacific sought to exclude certain opinions and testimony of Miller's experts Dr. Heber Crockett, Dr. Kenneth Weiss, and Jeffery Opp. Swift and Mohamed also seek to exclude testimony from these experts. Filing 177; Filing 183; Filing 186. Swift and Mohamed's motions are considered below.

Swift and Mohamed's motion to exclude testimony by Union Pacific's experts Foster Peterson and Benjamin Royall, Filing 192, is also denied as moot. Remaining at issue here are five motions in limine brought by Swift and Mohamed. Four of the remaining motions seek to exclude proposed expert testimony. Filing 177; Filing 180; Filing 183; Filing 186. In the fifth motion, Swift and Mohamed seek to exclude statements Mohamed made during his 911 call on the night of the collision. Filing 189. The Court addresses each in turn.

## II. ANALYSIS

### A. *Daubert* Standard

Under Federal Rule of Evidence 702, expert opinion testimony is admissible if it will "help the trier of fact to understand the evidence or to determine a fact in issue," it is "based upon sufficient facts or data," and it is "the product of reliable principles and methods" which have been reliably applied "to the facts of the case." Fed. R. Evid. 702. The court must be mindful that expert opinions "can be both powerful and quite misleading." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 595, 113 S. Ct. 2786, 2798, 125 L. Ed. 2d 469 (1993). In considering admissibility, the district court's job as gatekeeper is to "ensure that all scientific testimony is both reliable and relevant." *Marmo v. Tyson Fresh Meats, Inc.*, 457 F.3d 748, 757 (8th Cir. 2006) (citing *Daubert*, 509 U.S. at 580, 113 S. Ct. at 2790, 125 L. Ed. 2d). The inquiry "is a flexible one designed to 'make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.'" *Id.* (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152, 119 S. Ct. 1167, 1176, 143 L. Ed. 2d 238 (1999)). "Courts should resolve doubts regarding the usefulness of an expert's testimony in favor of admissibility." *Id.* at 758. However, "[e]xpert testimony is inadmissible if it is speculative, unsupported by sufficient facts, or contrary

to the facts of the case." *In re Wholesome Grocery Prods. Antitrust Litig.*, 946 F.3d 995, 1001 (8th Cir. 2019) (citing *Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1057 (8th Cir. 2000)).

"A district court has great latitude in determining whether expert testimony meets the reliability requisites of Rule 702." *Craftsmen Limousine, Inc. v. Ford Motor Co.*, 363 F.3d 761, 776 (8th Cir. 2004). To meet the reliability requirement, the proponent of an expert opinion must show "that the expert is qualified to render the opinion and that the methodology underlying his conclusions is scientifically valid." *Marmo*, 457 F.3d at 757-58; *see also Daubert*, 509 U.S. at 592-93, 113 S. Ct. at 2796, 125 L. Ed. 2d (stating that the court must assess "whether the reasoning or methodology underlying [an expert opinion] is scientifically valid"). "[C]onclusions and methodology are not entirely distinct from one another." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146, 118 S. Ct. 512, 519, 139 L. Ed. 2d 508 (1997). "When the analytical gap between the data and proffered opinion is too great, the opinion must be excluded." *Marmo*, 457 F.3d at 758.

To satisfy the relevance requirement, the proponent of an expert opinion must demonstrate "that the reasoning or methodology in question is applied properly to the facts in issue." *Id.* A court is not required to "admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Joiner*, 522 U.S. at 146, 118 S. Ct. at 519, 139 L. Ed. 2d. In exercising its gatekeeping role under *Daubert*, the court must focus "specifically on the methodology." *Synergistics, Inc. v. Hurst*, 477 F.3d 949, 955 (8th Cir. 2007).

**B. Plaintiff's Expert Dr. Heber Crockett**

Swift and Mohamed move to exclude certain opinions of Miller's expert, Dr. Heber Crockett, and a report of Miller's physical limitations that Dr. Crockett relied upon. Filing 177. Dr. Crockett was one of Miller's treating physicians and performed surgery on both of his shoulders following the collision at issue here. Filing 179-1 at 3-4. Miller designated Dr. Crockett

4

as an unretained witness under Federal Rule of Civil Procedure 26(a)(2)(C). Filing 178 at 2. Accordingly, Miller submitted a summary of the facts and opinions Dr. Crockett was expected to testify to, but he did not submit the detailed expert report required of retained experts designated under Rule 26(a)(2)(B). Filing 178 at 2. Swift and Mohamed move to exclude Dr. Crockett's opinion that the collision caused his left shoulder injury for untimely disclosure and unreliable methodology. Filing 178 at 6-10. They also move to exclude Dr. Crockett's opinions regarding Miller's functional limitations as well as the functional capacity evaluation ("FCE") that Dr. Crockett relied upon in reaching his conclusions, arguing both are unreliable and fail to properly apportion Miller's limitations among several potential causes. Filing 178 at 10-11. Miller argues he timely disclosed Dr. Crockett's opinions in accordance with Federal Rule of Civil Procedure 26. Filing 218 at 2. Miller further argues Dr. Crockett's opinions on the cause of Miller's injuries and functional limitations and the FCE he utilized are all sufficiently reliable for admission. Filing 218 at 2-3. The Court considers the timeliness of Dr. Crockett's opinions, his methods, and the FCE in turn.

*1. The Timeliness of Dr. Crockett's Left-Shoulder Causation Opinions*

Swift and Mohamed contend Dr. Crockett's opinion that Miller's left-shoulder injuries were caused by the collision at issue in this case were not timely disclosed. Filing 178 at 6-7. It is undisputed that Miller provided timely notice that "Dr. Crockett would testify as to 'the causal relationship of these [shoulder] injuries to the incident of December 21, 2015.'" Filing 178 at 2 (alteration in original) (quoting 179-1 at 3 (Miller's Fourth Supplemental Expert Disclosure dated January 31, 2020)). Swift and Mohamed do not attack the timeliness or sufficiency of that notice directly. *See* Filing 178. Instead, Swift and Mohamed take issue with Dr. Crockett offering

causation opinions as to Miller's left-shoulder injuries at a "trial" deposition[3] on October 7, 2020, that differ from opinions he offered in his previous deposition, on April 15, 2020. *See* Filing 178 at 2-3. Specifically, during the April deposition, Dr. Crockett stated he "couldn't be convinced either way" and that he did not have an opinion whether the collision caused Miller's left-shoulder injury. Filing 178 at 2 (quoting Filing 179-2 at 36). Then, during the subsequent October "trial" deposition, Dr. Crockett opined that both Miller's left- and right-shoulder injuries were "proximately caused" by the collision. Filing 178 at 3 (citing Filing 179-3 at 30). Smith and Mohamed argue Dr. Crockett's newly revealed opinion that the collision caused Miller's left-shoulder injuries should have been disclosed prior to the Court's final deadline for complete expert disclosures on September 25, 2020. Filing 178 at 6; *see* Filing 126 (Third Amended Final Progression Order setting disclosure deadlines). Miller opposes exclusion, arguing that his disclosure was timely and provided the requisite "summary of the facts and opinions to which the witness is expected to testify" under Federal Rule of Civil Procedure 26(a)(2)(C), and failing that, that any untimely disclosure was harmless. Filing 218 at 11-14. The Court agrees with Swift and Mohamed that the opinion at issue was not timely disclosed but agrees with Miller that the untimeliness was harmless.

Under Federal Rule of Civil Procedure 26(a)(2)(C), parties seeking to use testimony of an expert witness who is not retained specifically to provide an expert opinion are required to disclose only "the subject matter on which the witness is expected to present evidence" and "a summary of the facts and opinions to which the witness is expected to testify," "[u]nless otherwise stipulated or ordered by the court." This is in contrast to the more extensive disclosure required for an expert

---

[3] Typically, a "trial" deposition is one taken for the specific purpose of preserving testimony for use at trial, as opposed to a "discovery" deposition, used to discover the opposing party's evidence. The Court notes, "[n]either the Rules of Civil Procedure nor the Rules of Evidence make any distinction between discovery depositions and depositions for use at trial." *Henkel v. XIM Prods., Inc.*, 133 F.R.D. 556, 557 (D. Minn. 1991).

retained solely for the litigation. *See* Fed. R. Civ. P. 26(a)(2)(B) (stating an expert witness must prepare a full detailed report "if the witness is one retained or specially employed to provide expert testimony in the case or one whose duties as the party's employee regularly involve giving expert testimony"). Parties using retained expert witnesses covered under Rule 26(a)(2)(B) have a specific duty to supplement reports and expert depositions with any material changes by the time pre-trial disclosures are due. Fed. R. Civ. P. 26(e)(2). Further, "[a] party who has made a disclosure under Rule 26(a) . . . must supplement or correct its disclosure or response . . . as ordered by the court." Fed. R. Civ. P. 26(e)(1)(B). Untimely disclosure "is equivalent to failure to disclose." *Trost v. Trek Bicycle Corp.*, 162 F.3d 1004, 1008 (8th Cir. 1998). "The district court may exclude the information or testimony as a self-executing sanction unless the party's failure to comply is substantially justified or harmless." *Wegener v. Johnson*, 527 F.3d 687, 692 (8th Cir. 2008) (citing Fed. R. Civ. P. 37(c)(1)).

In relevant part, the Third Amended Final Progression order for the present action directed the parties to make "complete expert disclosures" for both retained and non-retained experts by September 25, 2020. Filing 126 at 2. Further, the order specifically addressed treating medical healthcare providers, such as Dr. Crockett, and ordered the parties to "separately and timely" disclose any opinions these experts would express that were not contained in their treatment records. Filing 126 at 2 n.1. Miller does not contend Dr. Crockett's causation opinions were included in his treatment records, and Dr. Crockett's depositions make clear he formed the opinions for the purpose of the present litigation, well after treating Miller. *See, e.g.*, Filing 179-2 at 31 (Dr. Crockett stating, "I guess I only end up [assessing causation], honestly, when I'm in a deposition . . . I don't really have a reason to do it otherwise because causation isn't always at issue . . . . A lot of times I don't care what caused it . . . ."). Because Dr. Crockett's opinions on the cause

of Miller's left-shoulder injury were not part of the treatment record, Miller had a duty to disclose them ahead of the court-imposed deadline of September 25, 2020. *See* Filing 126. Because the left-shoulder opinions were not disclosed until Dr. Crockett's "trial" deposition on October 7, 2020, their disclosure was untimely. *See* Filing 178 at 3 (citing Filing 179-3 at 30-39).

Swift and Mohamed ask the Court to exclude Dr. Crockett's left-shoulder causation opinions under Federal Rule of Civil Procedure 37(c)(1). Filing 178 at 6. Miller argues any untimeliness was harmless, and therefore the Court should not exclude Dr. Crockett's opinions. Filing 218 at 13-14. Rule 37(c)(1) provides that if information that is not properly disclosed under "Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." The Court notes that "the exclusion of evidence is a harsh penalty and should be used sparingly." *Wegener*, 527 F.3d at 692 (quoting *ELCA Enters. v. Sisco Equip. Rental & Sales*, 53 F.3d 186, 190 (8th Cir. 1995)). Factors the Court considers in deciding whether to exclude evidence in response to a failure to disclose include "the reason for noncompliance, the surprise and prejudice to the opposing party, the extent to which allowing the information or testimony would disrupt the order and efficiency of the trial, and the importance of the information or testimony." *Id.* (citing *Sellers v. Mineta*, 350 F.3d 706, 711–12 (8th Cir. 2003)).

The only reason offered by Miller or Dr. Crockett for the late revelation of his left-shoulder causation opinions was that when reviewing his notes during his initial deposition, Dr. Crockett overlooked that Miller had discussed his left shoulder pain in relation to the accident and not just his right shoulder, as Dr. Crockett had thought. Filing 218 at 14; Filing 179-3 at 39. This is not a legal justification for failing to disclose Dr. Crockett's altered causation opinion, as "failure to exercise due diligence with respect to [an] expert's review of relevant medical records . . . does

not substantially justify [an] untimely disclosure." *See Wegener*, 527 F.3d at 693. However, while Dr. Crockett's opinion that the collision caused Miller's left-shoulder injury may have come as a surprise to Swift and Mohamed, there is no indication of prejudice to them. Defense counsel conducted a thorough cross-examination of Dr. Crockett during the October 7, 2020, deposition, directly addressing his newly formed opinion, pointing out the inconsistencies between his depositions, and ascertaining his justifications for those inconsistencies. Filing 179-3 at 35-39. Further, defense counsel aptly probed Dr. Crockett's methods of forming or declining to form opinions as to both of Miller's shoulders during both depositions at issue, ensuring the ability to adequately cross-examine him. *See, e.g.*, Filing 179-2 at 22 (discussing Dr. Crockett's opinions regarding tears in the left and right shoulders); Filing 179-3 at 38 (Dr. Crockett addressing his discussion with Miller regarding both shoulders). Additionally, Swift and Mohamed have already disclosed opinions from two experts refuting Dr. Crockett's opinion that any serious injury to his shoulders was attributable to the collision. *See* Filing 219-4; Filing 219-5. Thus, Dr. Crockett's change of mind in attributing Miller's left shoulder issues to the collision is a change Defendants are uniquely prepared to address. Finally, the issue of causation is indisputably important here, and while the intended purpose of the October deposition at which Dr. Crockett revealed his opinion that the collision caused Miller's left-shoulder injuries was to preserve his testimony for trial, the trial itself is not scheduled until over seven months from the date of that deposition, giving the defense ample time for any additional preparations now required. *See* Filing 163 (Order setting trial for May 11, 2021). Accordingly, the Court finds the untimely disclosure was harmless.

   *2. Dr. Crockett's Methodology and Reliability*

   Swift and Mohamed move to exclude Dr. Crockett's opinions that the collision caused Miller's left-shoulder injuries on grounds of methodology and reliability, contending that Dr.

Crockett's causation opinions are unreliable because he did not adequately rule out other potential causes of Miller's shoulder injuries. Filing 178 at 8-9 ("In this case, Dr. Crockett did not perform anything resembling a differential diagnosis to render his . . . opinions on the cause of Miller's left shoulder injury . . . ."). Miller contends Dr. Crockett performed an adequate differential diagnosis while treating him, considering the temporal relationship between the collision and Miller's pain, his medical history, a physical examination, and radiographic studies. Filing 218 at 19. Miller also asserts that Dr. Crockett adequately distinguished between Miller's acute symptoms, stemming from the collision, and any degenerative condition of his shoulders unrelated to the collision. Filing 226 at 7. The Court agrees with Swift and Mohamed that Miller has failed to demonstrate Dr. Crockett's methodology in assessing causation of Miller's left-shoulder injuries was reliable.

"A treating physician's expert opinion on causation is subject to the same standards of scientific reliability that govern the expert opinions of physicians hired solely for purposes of litigation." *Brooks v. Union Pac. R. Co.*, 620 F.3d 896, 900 (8th Cir. 2010) (quoting *Turner v. Iowa Fire Equip. Co.*, 229 F.3d 1202, 1207 (8th Cir. 2000)). "[A] medical opinion about causation, based upon a proper differential diagnosis, is sufficiently reliable to satisfy *Daubert*." *Turner*, 229 F.3d at 1208. "A district court may exercise its gatekeeping function to exclude only those diagnoses that are scientifically invalid." *Glastetter v. Novartis Pharm. Corp.*, 252 F.3d 986, 989 (8th Cir. 2001). When a treating doctor comes to an opinion on medical causation of injury as an afterthought, without attempting to consider all possible causes of the injury, it indicates no proper differential diagnosis was performed. *See Kudabeck v. Kroger Co.*, 338 F.3d 856, 861 (8th Cir. 2003) (distinguishing the case in which a chiropractor considered and then ruled out likely potential causes of a back condition as part of ongoing treatment from the case in *Turner*, in which

10

a doctor assumed fire extinguisher chemicals caused a patients lung issues only after being alerted to the possibility and without ruling out other causes).

In *Kudabeck*, a chiropractor was permitted to offer his opinion that his patient's fall at a supermarket contributed to her degenerative disc disease. *Id.* at 860. The court distinguished *Kudabeck* from *Turner*, noting that the defendant in *Kudabeck* made no claim the treating expert "missed an essential fact in his methodology," and the expert had compared pre- and post- incident x-rays and followed normal chiropractic procedures in treating the plaintiff. *Id.* at 860-61. While in *Turner*, the court noted, the treating physician arrived at his opinion that certain chemicals had caused his patient's lung injury as an afterthought and outside the normal course of treatment. *Id.*

Dr. Crockett's assessment of Miller's left shoulder is more like that of the doctor in *Turner* than the that of the chiropractor in *Kudabeck*. Dr. Crockett was clear in his initial deposition that the cause of the Miller's shoulder injuries had little bearing on his treatment and became a concern only later, for the purposes of the present litigation. *See* Filing 179-2 at 31 ("I guess when I'm doing surgeries and I see something, it's like, okay, this guy's got a cuff tear and I fix it . . . I don't really have a reason to [assess causation] otherwise because causation isn't always at issue until we're here."). It is also evident that Dr. Crockett had, at best, limited knowledge of Miller's relevant medical history. Filing 179-2 at 68 (Dr. Crockett admitting he had no history of Miller's shoulder issues or other injuries, including back and knee issues, from prior to the collision). Further, Dr. Crockett overlooked or was not made aware of pre-collision radiology of Miller's shoulders; he also admitted it would be appropriate for a medical expert determining causation to review such film and stated he would do so in the normal practice of medicine. Filing 179-2 at 27-28.

Dr. Crockett's stated methodology with regard to the left shoulder is most concerning. The collision occurred on December 21, 2015, and Miller received no significant medical treatment on that night. Filing 136-2 at 10-11. In the days following the collision, Miller sought treatment for being "banged up" from a chiropractor. Filing 136-2 at 10. According to Dr. Crockett, he first saw Miller on May 25, 2016. Filing 179-3 at 7. Miller brought him MRI film of both of his shoulders dated April 29, 2016. Filing 179-3 at 9. Dr. Crockett also ordered X-rays. Filing 179-3 at 9. Dr. Crockett performed surgery on Miller's right shoulder on July 12, 2016. Filing 179-3 at 14. He did not operate on Miller's left shoulder until February 23, 2017, over a year after the collision occurred. Filing 179-3 at 34.

When Dr. Crockett was first deposed in this case in April 2020, he stated he could not reach a definitive conclusion as to whether the collision caused Miller's left-shoulder injury because the damage he observed while operating on Miller's left shoulder did not provide sufficient proof. Filing 179-2 at 73 ("I think the left shoulder, it could've been hurt in the accident but I can't definitively say because of what I saw in the OR that I can say, oh, for sure was acute."). In his October 2020 deposition, Dr. Crockett changed course and stated he believed the collision caused injuries to both of Miller's shoulders. Filing 179-3 at 31. When asked about changing his opinion as to causation of Miller's left-shoulder injuries between depositions, Dr. Crockett reiterated that "[Miller's left-shoulder surgery] was a year later, and it's hard to go in there and say it's acute, when you're actually in there." Filing 179-3 at 36. He then stated he had overlooked that Miller had talked about pain in both shoulders during their initial meeting and was "basing everything on the fact that [Miller] complained about both shoulders to [him] on the first visit." Filing 179-3 at 36-37. Thus, despite Dr. Crockett's acknowledgment that the medical evidence before him was inconclusive, he determined that the left-shoulder injury must have been caused by the accident,

12

in essence, because that is what Miller told him. Dr. Crockett's methodology in determining that the collision caused the left-shoulder injuries raises serious questions of reliability. Accordingly, the Court excludes Dr. Crockett's opinion that the collision caused Miller's left-shoulder injuries.

*3. The FCE*

Defendants ask the Court to exclude the FCE detailing Miller's work restrictions and any of Dr. Crockett's opinions based on the FCE. Filing 178 at 10-11. The FCE was performed by a physical therapist who had previously treated Miller. Filing 179-3 at 45-46. Dr. Crockett discussed two opinions based on the FCE in his deposition. Filing 179-2. First, he discussed his opinion that Miller had permanent work restrictions. Filing 179-2 at 59. Second, he opined that the FCE evaluation results and associated permanent restrictions were related to injuries occurring during the collision. Filing 179-2 at 60. Swift and Mohamed argue the FCE is unreliable as a result of being based on an incomplete medical history and because it fails to apportion Miller's limitations to specific injuries or parts of his body. Filing 178 at 10-11. They also allege the FCE was biased because it was conducted by a physical therapist who had worked with Miller in the past. Filing 178 at 11. Miller argues the allegations of bias are misplaced. Filing 218 at 22. He further argues the FCE need not apportion limitations among injuries to be admissible, and any lack of relevant medical history goes to the weight rather than the admissibility of the FCE and Dr. Crockett's opinions. Filing 226 at 8-9. The Court finds issue only with Dr. Crockett's opinion that Miller's limitations are related to the collision.

Swift and Mohamed's allegation that the FCE was biased to the point of inadmissibility is without merit. They argue that the FCE should be excluded under Federal Rule of Evidence 703 because the FCE is the product of a biased evaluator and thus not the sort of data reasonably relied upon by experts in Dr. Crockett's field. Filing 178 at 11. However, they offer no indication that

the FCE was biased in fact; they merely point to Dr. Crockett's acknowledgment of the chance of bias when an evaluator knows the patient he is evaluating and the fact that Miller had received treatment from his evaluator before. Filing 178 at 11. Without some showing that the FCE in question was conducted using a non-standard method, the Court finds no reason to doubt it would be the sort of diagnostic tool used in the field, as Dr. Crockett explained. *See* Filing 179-3 at 46. Here, the issue of bias is best reserved for cross-examination.

Similarly, the Court does not agree that the FCE was unreliable as a regularly used diagnostic tool because it was conducted without complete knowledge of Miller's relevant medical history. *See* Filing 178 at 10 ("the FCE lumps into its analysis Miller's left shoulder, back, and knee conditions"). Swift and Mohamed argue that because some historical medical data was lacking, the FCE is flawed. Filing 178 at 10 ("Dr. Crockett was wholly unaware of Miller's back and knee issues."). The Court's focus in considering a *Daubert* motion is on methodology, however. *Hurst*, 477 F.3d at 955. The FCE was used to assess limitations in Miller's ability to physically perform in accordance with his job requirements; it was not aimed at determining the cause of any limitations. *See* Filing 179-2 at 53-55 (Dr. Crockett reading the FCE detailing what Miller could and could not do). Dr. Crockett's opinion that the limitations were related to the collision were something apart from the FCE itself, though based in part on it. The Court sees no cause for concern in the methodology employed in conducting Miller's FCE and therefore no reason to exclude it. It follows, of course, that Dr. Crockett's opinion that Miller has permanent limitations that make work restrictions necessary is also admissible, as it is based on the same method that was reliably employed here.

Dr. Crockett's opinion that Miller's work restrictions are related to the collision is necessarily tied to his conclusion that the collision caused both of Miller's shoulder injuries,

14

however. *See* Filing 179-3 at 52 (stating "I don't have a way to differentiate between the two" when asked if he could say "one way or another if it's the right or the left shoulder" that causes Miller's work limitations). Further, Swift and Mohamed point out that Dr. Crockett was unaware of and therefore could not have considered and ruled out other causes of Miller's limitations, such as his preexisting back and knee problems. Filing 178 at 10. Thus, the Court cannot say that Dr. Crockett reached his opinion through sound methodology. While Dr. Crockett may testify an acute shoulder injury is a likely cause to Miller's functional limitations, he lacks sufficient data and methodology to conclude the collision caused the injuries. Thus, Dr. Crockett's specific causation opinion that Miller's functional limitations were caused by the collision will be excluded.

### C. Plaintiff's Expert Dr. Ted Sokol

Swift and Mohamed move to exclude all opinions offered by Miller's expert, Dr. Ted Sokol. Filing 180; Filing 181 at 1-2. Dr. Sokol has a doctorate in civil engineering and is a well-qualified expert in accident reconstruction. *See* Filing 221-3. Miller retained Dr. Sokol to reconstruct the collision at issue in this case. Filing 182-1 at 1. In his report, Dr. Sokol offers nine conclusions and opinions regarding Mohamed's actions leading up to the accident.[4] Filing 182-1 at 6. Swift and Mohamed argue all of Dr. Sokol's proposed testimony should be excluded because

---

[4] Dr. Sokol's report offered the following conclusions and opinions: (1) Mohamed was disoriented as he approached Sidney, Nebraska; (2) The evidence indicates that Mohamed exited I-80 eastbound at Exit 48, the Spur 17C interchange, at a point approximately eleven miles west of his destination of Sidney, Nebraska; (3) After exiting I-80 eastbound Mohamed travelled north on Spur 17C until he reached Highway 30. It was at this junction that Mohamed inadvertently made a left turn to go westbound on Highway 30 rather than a right turn to head eastbound directly into Sidney, Nebraska; (4) Mohamed should have seen the STOP sign, Private RR Crossing – "X" No Trespassing sign, and the RR crossing; (5) As Mohamed stated, "He blames only himself for the collision."; (6) In all likelihood the GPS would not have directed Mohamed to make a series of right turns onto a private road; (7) Mohamed was not directed by the GPS to make a right turn onto the private road leading to RR crossing #817842H; (8) After Mohamed incorrectly made the left turn onto Highway 30 from Spur 17C, the GPS attempted to re-direct Mohamed back to the west to EXIT 38 (Potter, Nebraska), the first public road exit off of Highway 30 west of EXIT 48, so as to have him return to I-80 eastbound and back east toward EXIT 59, the proper Sidney, Nebraska exit; (9) In the fog and darkness, before exiting I-80 eastbound, Mohamed had to have observed the EXIT 48 sign, the exit ramp at EXIT 48 and after exiting I-80 eastbound in the fog and darkness he must have observed the STOP sign at Spur 17C, the STOP sign at Highway 30, and the unmarked private road leading to the RR crossing #817842. Filing 182-1 at 6.

his methodology renders his opinions unreliable, his opinions are unhelpful to the trier of fact, and he exceeds his expertise with respect to his comments on Mohamed's global positioning system ("GPS") based navigation. Filing 181. Miller contends Swift and Mohamed attack the weight rather than the admissibility of Dr. Sokol's conclusions and maintain his experience using GPS devices qualifies him to opine about them. Filing 220. Dr. Sokol's opinions can be broadly grouped as those involving Mohamed's route of travel, opinions concerning the operation of Mohamed's GPS-based navigation equipment, and opinions as to what Mohamed should have seen.[5] *See* Filing 182-1 at 6. The Court will address each in turn.

### 1. Opinions Concerning Mohamed's Route of Travel

Swift and Mohamed ask the Court to exclude Dr. Sokol's opinions concerning the route taken by Mohamed from the interstate to the crossing where the collision occurred as well as his associated conclusions. Filing 181 at 7-8. They argue Dr. Sokol's analysis is fatally flawed because he incorrectly assumed Mohamed's destination was the Cabela's retail store in Sidney, Nebraska, while his destination was actually the Cabela's distribution warehouse located over ten miles northwest of the retail store. Filing 181 at 7-8. Miller argues the assumed destination goes the weight of Dr. Sokol's testimony, not its admissibility. The Court cannot agree with Miller.

While the Court focuses "specifically on methodology" when conducting its *Daubert* analysis, *Hurst*, 477 F.3d at 955, "conclusions and methodology are not entirely distinct from one another," *Joiner*, 522 U.S. at 146, 118 S. Ct. at 519, 139 L. Ed. 2d 508. Further, "[w]hen the analytical gap between the data and proffered opinion is too great, the opinion must be excluded." *Marmo*, 457 F.3d at 758. Dr. Sokol's analysis of Mohamed's route was founded on the demonstrably incorrect factual assumption that Mohamed was driving to a store in Sidney,

---

[5] Dr. Sokol's "opinion" that "[a]s Mohamed stated 'He blames only himself for the collision'" is not an opinion or conclusion; it is a mere restatement of Mohamed's deposition testimony. *See* Filing 182-1 at 6.

Nebraska, which was over ten miles southeast from where Mohamed was actually headed. *Compare* Filing 182-1 at 1 (noting I-80 Exit 59 leads directly to Cabela's in Sidney), *with* Filing 182-3 (indicating Mohamed's actual destination). Thus, there is a large "analytical gap" between the data and the opinions offered by Dr. Sokol. In short, Mohamed obviously had good reason to be taking exit 48 from interstate 80, rather than exit 59, given his intended destination was not the store in Sidney. *See* Filing 182-1 at 6. Dr. Sokol's reasoning that Mohamed's left turn onto highway 30 was wrong, meaning Mohamed must have been trying to get back to interstate 80, rests on a critical and incorrect assumption. Filing 182-1 at 6. Thus, the Court finds Dr. Sokol's analysis of Mohamed's route of travel to the crossing was methodologically unsound, and any conclusions he draws from or about it, such as what Mohamed was trying to accomplish, are unreliable and inadmissible.

### 2. Opinions Concerning GPS Navigation

Swift and Mohamed next challenge the admissibility of Dr. Sokol's opinions that the GPS navigation Mohamed used would likely not have directed him onto any private road and did not direct him onto the private road leading to the rail crossing, because Sokol is not a GPS expert. Filing 181 at 8. Miller argues Dr. Sokol's past use of GPS devices qualifies him to opine on how Mohamed's device was likely to have functioned. Filing 220 at 14. The Court agrees with Swift and Mohamed that Dr. Sokol lacks any relevant expertise to opine on how Mohamed's GPS likely directed him.

"An expert is one who has specialized 'knowledge, skill, experience, training, or education.'" *Kozlov v. Associated Wholesale Grocers, Inc.*, 818 F.3d 380, 394 (8th Cir. 2016) (quoting Fed. R. Evid. 702). Dr. Sokol testified in his deposition that he had experience using GPS in his work and personally, but he was unfamiliar with system design. Filing 182-1 at 52. Using

GPS as a tool while employing one's expertise does not make one an expert on the GPS devices themselves, however. Dr. Sokol's status as an expert engineer and accident reconstructionist has no bearing on his expertise with respect to GPS. The Court finds nothing to indicate Dr. Sokol's experience with GPS gave him anything other than a lay understanding of GPS and associated navigation devices. Accordingly, the opinions he offers as to how Mohamed's GPS likely directed his travel are lay opinions without an adequate basis and must be excluded.

### 3. Opinions on What Mohamed Should Have Seen

Finally, Swift and Mohamed argue Dr. Sokol's opinion that Mohamed could see all signage at the crossing should be excluded because he failed to employ sufficient scientific rigor in arriving at that conclusion. Filing 181 at 9-10. Miller counters that Dr. Sokol's methodology was reliable because he used "a computer program to create a screenshot using the locomotive video and a computer program that breaks down the video frame-by-frame" and used "mathematical analysis" to determine which frame to screenshot so it would correspond to 115 feet of distance from camera to truck. Filing 220 at 14. The Court agrees with Swift and Mohamed that Dr. Sokol's conclusions regarding what Mohamed could see are not reliably supported with the requisite academic rigor.

Here again, "the analytical gap between the data and proffered opinion is too great, [and] the opinion must be excluded." *Marmo*, 457 F.3d at 758. Dr. Sokol conducted a detailed mathematical analysis to estimate the distance the truck was from the train when it became visible on the footage taken from the train's onboard camera; he concluded it was 386 feet away. *See* Filing 182-2 at 29-34. He then calculated which frame of the video corresponded with the camera being 115 feet away from the truck and used a still of that frame to determine what could be seen by the train's camera at that distance. Filing 182-2 at 32. Then using his estimate that the truck was 115 feet from the crossing when Mohamed first turned down the road approaching it, he

reached conclusions about what Mohamed could have seen on the basis of the footage from the train. *See* Filing 182-2 at 29-34. Dr. Sokol did not conduct any further analysis of what could be seen from Mohamed's truck; he admitted he did not perform any analysis from the perspective of the driver of a tractor-trailer and did not know the grade of the road approaching the crossing. *See* Filing 182-2 at 29-34. Thus, there is a significant analytical gap between Dr. Sokol's data, consisting of what the train's camera could "see" sometime after Mohamed approached the crossing, and his opinion as to what the Mohamed could see from a completely different perspective some time before. Further, absent some analysis specific to the truck or Mohamed, a jury is just as capable as Dr. Sokol at inferring that Mohamed should have been able to see something 115 feet away based on the footage and testimony of others establishing the estimated distances. Thus, Dr. Sokol's opinion as to what Mohamed could see will be excluded.

### D. Plaintiff's Expert Dr. Kenneth Weiss

Swift and Mohamed move to exclude the proposed testimony of Miller's expert, Dr. Kenneth Weiss. Filing 183. Dr. Weiss is a board-certified psychiatrist. Filing 185-2 at 10. He became a medical doctor in 1973 and has practiced psychiatry since then. Filing 185-2 at 10. Dr. Weiss estimates forty percent of his current work is conducting forensic psychiatric exams and sixty percent is as a clinical professor of psychiatry at the University of Pennsylvania. Filing 185-2 at 84-85. He does not currently treat patients. Filing 185-2 at 84.

Miller retained Dr. Weiss to conduct a forensic review of Miller's case and to offer expert opinion "on the nature and extent of [Miller's] psychiatric condition that is linked to his work-related experiences." Filing 185-1 at 1. Dr. Weiss reviewed Miller's mental- and physical-health treatment records since the collision, psychologist-exam records, and other background information about Miller. Filing 185-1 at 1-2. Dr. Weiss formed the opinions that Miller suffered

traumatic events during his employment with Union Pacific, beginning with Miller's involvement in an earlier train-vehicle collision in 2011, which damaged him physically and psychologically. Filing 185-1 at 7. Specifically, Dr. Weiss concurred with the assessment of clinicians who determined that Miller suffers from PTSD. Filing 185-1 at 7. He further opined Miller's condition is chronic, Miller is completely disabled from "railroad work," and the December 2015 collision at issue here was "a substantial factor" in bringing about Miller's PTSD. Filing 185-1 at 7. He also made treatment recommendations and provided associated cost estimates. Filing 185-1 at 7.

Swift and Mohamed ask the Court to exclude Dr. Weiss's proposed testimony, attacking his methodology as lacking under *Daubert*. Filing 184 at 5-10. Their primary complaint is that Dr. Weiss failed to rule out potential causes of Miller's PTSD other than the December 2015 collision at issue here. Filing 184 at 7-9. Swift and Mohamed also mention some traditional factors courts consider under *Daubert* as supporting exclusion and take issue with Dr. Weiss's treatment recommendations and cost estimate, arguing they are opinions beyond his expertise. Filing 184 at 5-7, 10. Miller argues Dr. Weiss's methods conform with accepted methods of forensic psychiatry and *Daubert*'s standard of scientific rigor and reliability. Filing 222. The Court agrees with Miller that Dr. Weiss's methodology is sufficiently rigorous and reliable under *Daubert*.

"[A] medical opinion about causation, based upon a proper differential diagnosis is sufficiently reliable to satisfy *Daubert*." *Bland v. Verizon Wireless, L.L.C.*, 538 F.3d 893, 897 (8th Cir. 2008) (quoting *Turner*, 229 F.3d at 1208). "In performing a differential diagnosis, a physician begins by 'ruling in' all scientifically plausible causes of the plaintiff's injury. The physician then 'rules out' the least plausible causes of injury until the most likely cause remains." *Glastetter*, 252 F.3d at 989. Swift and Mohamed assert that Dr. Weiss did not adequately rule out a 2011 collision that Miller was involved in, during which a man died, as a potential cause of his PTSD. Filing 184

20

at 8. They also argue Dr. Weiss did not adequately rule out the chance Miller was lying about his symptoms or history. Filing 184 at 8-9. Dr. Weiss testified during his deposition, however, that he considered the 2011 collision and ruled it out because, based on Miller's reported history and symptoms, he did not have PTSD before the 2015 collision at issue. Filing 185-2 at 46. Dr. Weiss acknowledged Miller had lasting effects from the 2011 incident but explained why he thought the 2015 collision was a more significant cause of his current PTSD. Filing 185-2 at 51. Dr. Weiss also considered multiple clinical and psychological reports detailing Miller's PTSD, which led him to the conclusion that there was little chance Miller was lying or "malingering." *See, e.g.*, Filing 185-2 at 56 (Dr. Weiss discussing a psychologist's, Dr. Berry's, "cautions revolving around over-reporting" of symptoms yet still diagnosing Miller with PTSD, indicating such concerns were not material to his opinion). Defendants are free to question the choices and judgements Dr. Weiss made in conducting his "standard psychiatric interview examination, and assessment," Filing 185-2 at 15, but their disagreement with his reasons for ruling out certain factors during his differential analysis does not render his assessment methodologically lacking or unreliable under *Daubert*.

Because the Court finds Dr. Weiss's differential diagnoses were proper, it finds *Daubert* is satisfied. *See Turner*, 229 F.3d at 1208 ("[A] medical opinion about causation, based upon a proper differential diagnosis is sufficiently reliable to satisfy *Daubert*."). Thus the Court need not engage in a detailed analysis of the *Daubert* factors.[6] Briefly though, the Court notes it has "considerable latitude in determining whether expert testimony will assist the trier of fact and be reliable, and it may consider one or all of the *Daubert* factors in making this determination." *In re Air Crash at*

---

[6] The Eighth Circuit has identified the following, non-exhaustive list of factors a court may consider on a *Daubert* motion: (1) whether an expert's theory or technique can be tested; (2) whether a method has been subject to peer review; (3) the known potential error rate and standards for a technique; (4) the degree to which a method is accepted within the relevant scientific community; (5) whether the expertise was developed for litigation or the natural product of the expert's research; (6) whether the proposed expert ruled out alternative explanations; (7) whether the proposed testimony is sufficiently connected with the facts of the case. *Presley v. Lakewood Eng'g & Mfg. Co.*, 553 F.3d 638, 643 (8th Cir. 2009).

*Little Rock Ark., on June 1, 1999*, 291 F.3d 503, 514 (8th Cir. 2002). Dr. Weiss testified his methods were those widely accepted by the psychiatric community, a contention which Defendants have not refuted. *See* Filing 185-2 at 19 ("[T]he gold standard for the psychiatric assessment is the psychiatric examination."). Further, Dr. Weiss's proposed testimony is entirely connected to the facts of this case, and as discussed above, he ruled out other plausible explanations for his observations before coming to his conclusions. Thus, the Court is persuaded an analysis employing the *Daubert* factors yields the same result as consideration of Dr. Weiss's differential diagnoses. The Court also finds that Dr. Weiss has sufficient relevant experience to make treatment recommendations and rough cost estimates; while he no longer treats patients himself, his work as a clinical professor of psychiatry renders him qualified to make such assessments. The Court sees no cause to exclude Dr. Weiss's proposed testimony.

### E. Plaintiff's Expert Jeffrey Opp

Swift and Mohamed move to exclude the testimony of Miller's expert, Jeffrey Opp.[7] Filing 186. Opp is a forensic economist retained by Miller to present evidence of Miller's economic losses stemming from the collision. Filing 188-3 at 5; Filing 188-2 at 1. Opp's qualifications are not in question. *See* Filing 187. Defendants argue Opp employed unreliable methodology when assessing Miller's economic losses because of the actuarial method he employed and the information he relied upon. Filing 187 at 6-8. Miller counters that Opp's methods were scientifically sound and any assumptions or facts he utilized were sufficient to support a reliable analysis. Filing 224. The Court agrees with Miller.

---

[7] Swift and Mohamed also move to exclude Opp's "Rebuttal Report" dated November 3, 2020, as an untimely supplemental disclosure. Filing 187 at 8-9. Having reviewed the report, the Court finds it contains no new or altered opinions, it merely further explains the methodology Opp already used in light of criticisms. The report itself will not be admitted as evidence, but it should go without saying that Opp will be permitted to explain how he reached his opinions. *See* Fed. R. Evid. 705 ("Unless the court orders otherwise, an expert may state an opinion — and give the reasons for it . . . .").

and based solely on conjecture"). Accordingly, the Court finds Opp's conclusions are not so unsupported as to "offer no assistance to the jury." *Bonner*, 259 F.3d at 929-30.

Finally, Defendants assert Opp used an unreliable actuarial method in determining the loss of income Miller was likely to suffer over his life due to no longer being able to work for Union Pacific. Filing 187 at 7-8. Defendants argue Opp should have used the full "LPE (Life, Participation, Employment) method" or the uniform method to assess Miller's damages. Filing 187 at 7-8. As explained by Opp, the uniform method involves the use of a rail-worker specific actuarial table, a "work-life table," that accounts for three LPE factors: the chance of death in a given year, the chance a subject would become involuntarily unemployed, and the chance that a subject would have voluntarily removed himself from the workforce. Filing 188-3 at 51 (explaining the LPE method). Instead of employing the uniform method, Opp applied what he calls the "condensed" method, wherein he used an actuarial "life table" that accounts only for life expectancy. Filing 188-3 at 51. Opp explained that he accounted for the non-life LPE factors by considering Miller's planned age of retirement and the low probability of him being laid off given his seniority with Union Pacific. Filing 188-3 at 55. Opp also explained that the condensed method accounted for the same factors as the uniform approach. Filing 188-3 at 55. His explanation convinces the Court he employed accepted actuarial practice and made reasonable assumptions that other experts in the field would make given the facts of the present case. His methods are also easily tested by comparison with those Defendants suggest would be more prudent. That credibility determination should be left to the fact-finder. Accordingly, Opp's testimony is admissible.

### F. Mohamed's Statements on the 911 Call

Finally, Swift and Mohmed move to exclude certain statements Mohamed made in Somali during a call to 911. Filing 189. On recordings of his call, Mohamed can be heard speaking both

24

English and Somali. Filing 191-1. Union Pacific obtained a translation of the Somali portions of the calls. *See* Filing 191-1. The translation reveals Mohamed spoke to another man, his co-driver, and recited an Islamic creed referencing Allah and his messenger Muhammad in Somali while on the phone with emergency dispatchers. Filing 191-1 at 3-5. The translation also revealed that while on the phone, Mohamed asked his companion about a "smoke thing." Filing 191-1 at 4 ("I mean the smoke thing. Will they find something in my urine if I am tested?"). Swift and Mohamed argue these statements are irrelevant, unduly prejudicial, and should be excluded. Filing 190. Miller argues the "smoke thing" statement is highly relevant. Filing 229 at 6. Miller does not object to exclusion of Mohamed's religious statements. Filing 229 at 1 ("Miller has no objection to the motion to exclude or redact Mohamed's comments concerning the Muslim religion in his 911 calls . . . ."). Thus, the Court excludes Mohamed's references to Allah and Muhammad and addresses only Mohamed's "smoke thing" statement in detail.

Swift and Mohamed move to exclude Mohamed's statement, "I mean the smoke thing. Will they find something in my urine if I am tested?" and any references to that statement by other witnesses, specifically taking issue with the statement being introduced by Union Pacific's ESI experts, Peterson and Royall.[9] Filing 190 at 3-6. Swift and Mohamed argue the "smoke thing" statement is irrelevant because Mohamed's impairment is not at issue in the case, as indicated by Miller's failure to allege impairment in the pleadings. Filing 190 at 3. They also argue any probative value the statement might have is outweighed by its prejudicial effect because there is no evidence Mohamed was impaired in light of his declaration that the statement referred only to

---

[9] The experts that Swift and Mohamed specifically objected to using the statement were retained by Union Pacific. *See* 190 at 3-6; Filing 194-1. Miller takes no position on the use of the statement by experts. *See* Filing 229. Given that Union Pacific has been dismissed from the case, the Court does not rule on Swift and Mohamed's objection but briefly notes that Mohamed's statement speaks for itself without the need for opinions from those whose expertise is not in toxicology.

a tobacco hookah. Filing 190 at 3. Miller contends a jury should be permitted to weigh Mohamed's statement in considering what caused him to take the actions he did. Filing 229 at 6.

Under Federal Rule of Evidence 401, relevant evidence is that which "has any tendency to make a fact more or less probable than it would be without the evidence" where "the fact is of consequence in determining the action." "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. Evidence is unfairly prejudicial when it has "an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." *United State v. Anderson*, 783 F.3d 727, 745 (8th Cir. 2015) (quoting *United States v. Bell*, 761 F.3d 900, 912 (8th Cir. 2014)).

Mohamed's statement concerning the "smoke thing" and expressing concern over his ability to pass a urine screen in the immediate aftermath of the collision tends to make it more probable he was under the influence of some smoked illicit substance, even in the absence of other evidence confirming he was intoxicated. Impairment alone may not prove negligence, as Defendants note, *see* Filing 190 (citing *Phillip v. City of Omaha*, 227 Neb. 233, 238, 417 N.W.2d 12, 15 (1987)), but intoxication "is a circumstance which may be considered in determining whether [a person accused of negligence] exercised the degree of care . . . a prudent sober person would exercise under the same or similar circumstances," *Webber v. City of Omaha*, 190 Neb. 678, 681, 211 N.W.2d 911, 914 (1973). As to Mohamed's explaination that he was referring to smoking tobacco from a hookah and not some illicit substance, he can provide it to the jury if needed. *See* Filing 190 at 4 (noting Mohamed's affidavit in which he avers the "smoke thing" was a tobacco

hookah and he was not under the influence of illegal drugs during the incident). The jury should be allowed to determine what weight Mohamed's comments should be given. *See* Filing 190 at 2.

Further, federal courts will appropriately admit evidence of drug use when it bears on the witness's ability to recall and perceive events and to accurately testify about them. *See, e.g.*, *United States v. Robinson*, 583 F.3d 1265, 1272, 1274–75 (10th Cir. 2009); *Kunz v. DeFelice*, 538 F.3d 667, 677 (7th Cir. 2008) (explaining that evidence of drug use may be used to impeach a witness's recollection of events but not for the impermissible "inference that drug users tend to lie"). As the driver of the truck and a witness/participant to many relevant events in this case, Mohamed's credibility as a witness is sure to be at issue; his ability to perceive and remember the events of that night will be of critical importance. Mohamed's concern with the "smoke thing" and its impact on his ability to pass a urinalysis is probative both of his potential negligence and his credibility as a witness. Any danger of unfair prejudice is outweighed by the probative nature of the statement. Therefore, the Court denies Swift and Mohamed's motion to exclude the "smoke thing" statement.

### III. CONCLUSION

For the reasons stated herein,

IT IS ORDERED:

1. Swift and Mohamed's motion to exclude certain opinions and testimony of Dr. Heber Crockett, Filing 177, is denied in part and granted in part as discussed herein;

2. Dr. Crockett's opinions that the collision caused Miller's left-shoulder injuries and his work limitations are excluded, but Dr. Crockett may testify that Miller's physical limitations are consistent with the shoulder injuries Dr. Crockett observed;

3. Swift and Mohamed's motion to exclude the proposed expert testimony of Dr. Ted Sokol, Filing 180, is granted as discussed herein;

4. Dr. Sokol's proposed expert opinion testimony is excluded;

5. Swift and Mohamed's motion to exclude expert opinion testimony of Dr. Kenneth Weiss, Filing 183, is denied;

6. Swift and Mohamed's motion to exclude expert opinion testimony of Jeffrey Opp, Filing 186, is denied;

7. Swift and Mohamed's motion to exclude certain expert opinions and testimony of Union Pacific's ESI experts, Filing 192, is denied as moot;

8. Union Pacific's motion to exclude certain opinions and testimony of Swift and Mohamed's experts James Loumiet and Richard Beall, Filing 201, is denied as moot;

9. Union Pacific's motion to exclude certain opinions and testimony of Miller's experts Dr. Heber Crockett, Dr. Kenneth Weiss, and Jeffrey Opp, Filing 204, is denied as moot;

10. Swift and Mohamed's motion to exclude certain statements made by Mohamed on 911 tapes, Filing 189, is denied in part and granted in part as discussed herein;

11. Mohamed's religious statements referencing Allah and Muhammed on the 911 tape are excluded, but Mohamed's reference to a "smoke thing" are not excluded.

Dated this 12th day of March, 2021.

BY THE COURT:

Brian C. Buescher
United States District Judge